<u>NOT FOR PUBLICATION</u>

## <u>UNITED STATES DISTRICT COURT</u>
## <u>FOR THE DISTRICT OF NEW JERSEY</u>

| | | |
|---|---|---|
| LINDA FLETCHER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 02-3941 (JAG) |
| | : | |
| LUCENT TECHNOLOGIES, INC., | : | **O P I N I O N** |
| | : | |
| | : | |
| Defendant. | : | |
| | : | |

<u>**GREENAWAY, JR., U.S.D.J.**</u>

This matter comes before this Court on the motion of Defendant Lucent Technologies, Inc. ("Defendant" or "Lucent") for summary judgment on all counts of the complaint, pursuant to FED. R. CIV. P. 56.  For the reasons set forth below, this Court grants Defendant's motion.

## <u>BACKGROUND</u>

A.    <u>Plaintiff's Employment History with Defendant</u>

Plaintiff Linda Fletcher ("Plaintiff") is a former employee of Defendant.  In or about January 1979, Lucent hired Plaintiff as an engineering associate at Western Electric, Lucent's predecessor.  (Defendant's Statement of Undisputed Material Facts ("Def. SOF"), at ¶ 1; Plaintiff's Statement of Material Facts ("Pl. SOF"), at ¶ 1.)  Sometime in 1994, she was transferred to the position of Member of the Technical Staff-1  (MTS-1).  (Def. SOF ¶ 3.)  In 1996, Plaintiff joined the supply chain management group.  (Def. SOF ¶ 4; Deposition Transcript

of Plaintiff dated January 21, 2004 ("Pl. Dep. Tr."), at 31:11-13; Ex. B to Reply Certification of

Kelly M. Parker ("Parker Reply Cert.")).  Following her first performance evaluation in supply

chain management, Plaintiff was promoted to the SGB salary grade classification and given a

raise.  (Pl. Dep. Tr. 32:24; 33:4.)[1]  It is unclear who acted as her supervisor at the time that she

joined this group, but beginning in 1998 or 1999, Edward Sproles supervised Plaintiff until her

termination. (Deposition Transcript of Edward S. Sproles dated February 20, 2004 ("Sproles

Dep. Tr."), at 7:1-6.)  It further appears that Sproles conducted the assessment that formed the

basis for Lucent's inclusion of Plaintiff in a reduction-in-force ("RIF"), or in Lucent's terms, the

Force Management Plan ("FMP").  (Ex. D to Certification of Frances Buchalski ("Buchalski

Cert.")).[2]  Sproles characterized Plaintiff's work as "adequate" or "good" throughout her

employment.  (Sproles Dep. Tr. 12:13-16.)

  Sometime in mid- to late 2000, Sproles informed Plaintiff she was being  reclassified

from SGB to MTS.  (Pl. Dep. Tr. 46:24-47:2; Sproles Dep. Tr. 17:17-18:5.)[3]  Sproles told

Plaintiff that the salary band for SGB classified employees was lower than that for MTS

classified employees, i.e., if she progressed in MTS, she could exceed the highest possible salary

that SGB employees could earn.  (Sproles Dep. Tr. 16;16-19.)  Therefore, reclassification to

_____

[1]It appears that she was promoted in January 1997.  (Ex. B to Parker Reply Cert.)

[2]Buchalski is the Human Resources Advisory Council Senior Manager and FMP Plan
Administrator for Lucent.  (Buchalski Cert. ¶ 1.)

[3]Lucent's records indicate that she was transferred from SGB to MGR in October 1999
before she was classified to MTS in August 2000.  (Ex. B to Parker Reply Cert.)  Therefore, it
appears that Plaintiff's salary classification in Lucent progressed as follows (with dates in
parentheses reflecting the effective date of the classification): MTS-1 (January 1996); SGB
(January 1997); MGR (October 1999); MTS (August 2000).  (Ex. B to Parker Reply Cert.)

MTS would allow for greater salary growth, since she would occupy the lower end of a higher

salary band (MTS), rather than the higher end of SGB, a lower salary band.  (Pl. Dep. Tr. 44:11-

18.)  According to Sproles, his supervisor at the time, John Segelken, made the decision to

reclassify Plaintiff.  (Sproles Dep. Tr. 19:5-19:8.)

In November 2000, Plaintiff received a performance evaluation. (Ex. F to Certification of

Kerry M. Parker ("Parker Cert.")).  Sproles testified that Fletcher's performance for this

evaluation period was "good."  (Sproles Dep. Tr. 19:15-22.)

B.    Reduction in Force/ "Force Management Plan"

Beginning in early 2001, due to financial instability, Defendant initiated layoffs as part of

a company-wide reorganization.  (Deposition Transcript of John Hickey dated May 14, 2004

("Hickey Dep. Tr."), at 31:24-32:16.)  On April 30, 2001, Gary Timblin, then Sproles'

supervisor, informed Plaintiff she had been selected for inclusion in Lucent's Force Management

Plan ("FMP"), a company term for its reduction-in-force ("RIF").  (Deposition Transcript of

Gary L. Timblin dated January 30, 2004 ("Timblin Dep. Tr."), at 50:4-6.)  Under the FMP,

positions in Plaintiff's classification were being eliminated, and Plaintiff was informed that she

would be terminated in 60 days, unless she secured another position at Lucent within that time

period.  (Def. SOF ¶ 29; Pl. SOF ¶ 3.)  Plaintiff was given written information regarding the FMP

at that time.  (Timblin Dep. Tr. 51:9-25.)

Lucent's business unit management determines when business conditions require an

FMP.  (Timblin Dep. Tr. 50:9-15; Buchalski Cert. ¶ 6; Ex. A to Buchalski Cert.)  As a general

matter, when choosing which employees will be selected for FMP status, Lucent compared

employees situated in the same "universe" using neutral performance ratings.  (Buchalski Cert. ¶

3

11; Exs. C and D to Buchalski Cert.)  A "universe," for the purpose of the FMP process, describes the group of employees that serves similar functions for Lucent at the same location. (Buchalski Cert. ¶ 9.)

For the April 2001 FMP, Lucent compared the scores of Plaintiff against the nine other employees in her universe, MTS, all of whom were male.  Of those, seven were older than Plaintiff, and two were younger.  (Ex. E to Buchalski Cert.)  Lucent retained the five employees who had the most  favorable scores.  Of the five who were retained, all were male, and four of them were older than Plaintiff.  (Exs. D and E to Buchalski Cert.)[4]  Plaintiff never discussed the method by which she was evaluated or selected for FMP status with Sproles, Timblin, or other colleagues at Lucent.  (Pl. Dep. Tr. 179:16-20.)

C.      Lucent's 5+5 Plan

On May 29, 2001, Lucent issued a press release stating that it had been discussing the possibility of a merger with the French telecommunications company, Alcatel, but that these talks had concluded without success.  (Ex. J to Parker Cert.)  John Hickey, Lucent's Vice President of Compensation and Benefits, testified that, when the merger discussions with Alcatel ceased, Lucent realized it had to reduce payroll immediately to avoid insolvency. (Hickey Dep. Tr. 10:6-11:15.)

Hickey and his colleagues devised the 5+5 Plan ("the Plan") in an effort to induce voluntary retirement. (Hickey Dep. Tr. 11:24-13:22.)  Essentially, the Plan was a voluntary retirement program, offered between June 11, 2001 and July 13, 2001, which provided for the

_____

[4]As indicated supra at note 3, it appears that Plaintiff was reclassified from SGB to MGR before she ultimately was placed in MTS.

4

addition of five years of service and five years of age to those employees eligible to participate. (Pl. Dep. Tr. 150:6-20; Def. SOF ¶ 45; Exs. G and I to Parker Cert.)  Employees on FMP status were not eligible to participate.

By the time that the Plan was announced to employees, Plaintiff already had been placed on FMP status.  Plaintiff acknowledges that she received a June 6, 2001 email from the company announcing the Plan, and advising that employees who were on FMP status as of the date of the Plan's introduction were not eligible to participate.  (Pl. Dep. Tr. 151:21-152:2; Ex. I to Parker Cert.)  While Plaintiff did not qualify for the Plan, she does not claim deprivation of her otherwise acquired benefits.  (Compl. ¶ 6.)

Despite efforts to secure a position, Plaintiff was unable to find another position within Lucent within 60 days of being placed on FMP status.[5]  Accordingly, Lucent terminated her employment on June 28, 2001.  (Def. SOF ¶ 31.)

On February 7, 2002, Plaintiff filed a complaint asserting age and gender discrimination against Lucent with the Equal Employment Opportunity Commission ("EEOC").  On May 17, 2002, the EEOC issued a right-to-sue letter.  (Compl. ¶ 7.)

Plaintiff filed a complaint with this Court on August 12, 2002, which appears to allege the following: (1) discrimination based on age, pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"); (2) disparate treatment on the basis of gender, pursuant to 42 U.S.C. § 2000-2(a), or Title VII of the Civil Rights Act ("Title VII"); and

---

[5]Plaintiff testified that "Lucent deliberately road-blocked me from any available positions or any retention" (Pl. Dep. Tr. 175:23-176:8), but when asked, she could not identify any published positions in 2001 for which she was qualified but not hired.  (Pl. Dep. Tr. 176:9-178:7.)

(3) unlawful interference with attainment of enhanced pension and medical benefits, pursuant to 29 U.S.C. § 1140, or section 510 of the Employee Retirement Income Security Act ("ERISA").

## LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. See Anderson, 477 U.S. at 248. The moving party must show that, if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Sound Ship Bldg. Co. v. Bethlehem Steel Co., 533 F.2d 96, 99 (3d Cir. 1976), cert. denied, 429 U.S. 860 (1976). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-

moving party.  See Wahl v. Rexnord Inc., 624 F.2d 1169, 1181 (3d Cir. 1980).

## DISCUSSION

_____As stated above, Plaintiff seeks relief under three statutes: (1) the ADEA; (2) Title VII;

and (3) ERISA.  By its motion, Defendant seeks summary judgment on all of Plaintiff's claims.

For the reasons set forth below, Defendant's motion is granted.

A.        **ADEA and Title VII Claims**

Because the analyses of Plaintiff's claims of age and gender discrimination, under the

ADEA and Title VII, respectively, overlap substantially, these claims shall be treated together.

Under the ADEA, employers violate the statute if they "discharge any individual or

otherwise discriminate against any individual with respect to . . . compensation, terms,

conditions, or privileges of employment, because of such individual's age."  See 29 U.S.C. §

623(a)(1) (2004).  Title VII prohibits discrimination in employment based on, inter alia, sex.  See

42 U.S.C. § 2000e-2 (2004).  As in the instant case, a plaintiff seeking to establish claims of age

and gender discrimination may do so based upon indirect evidence of discrimination, pursuant to

the three-tiered, burden shifting framework set forth in McDonnell Douglas v. Green, 411 U.S.

792, 802 (1987).  See Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000) (applying the

McDonnell Douglas burden shifting framework to ADEA and Title VII claims).

_____McDonnell Douglas sets forth a three step process in examining claims of discrimination.

McDonnell Douglas, 411 U.S. at 802.  First, the plaintiff must establish a prima facie case of

discrimination.  See id.  If the plaintiff can establish a prima facie case of discrimination, the

burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse

employment action.  See id.

Finally, upon the defendant's satisfaction of this burden, the burden shifts back to the

7

plaintiff to show, by a preponderance of the evidence, that the articulated reason is pretext, masking a discriminatory motive.  See id. at 804; see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  To defeat a motion for summary judgment on the basis that the employer's proffered explanation is pretext for actual discrimination, "the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

      1.    Prima Facie Case of Discrimination

A plaintiff seeking relief under the ADEA and Title VII of course must satisfy different elements in order to establish a prima facie case of discrimination under these statutes.

To establish a prima facie case under the ADEA, Plaintiff must demonstrate that she: (1) was a member of the protected class, i.e., was over age forty; (2) was qualified to hold the position; (3) suffered an adverse action; and, in RIF cases, (4) that sufficiently younger workers were retained.  See Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 235 (3d Cir. 1999) (applying the reasoning of O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308 (1996), a non-RIF case, to the RIF context).

To establish a prima facie case under Title VII, Plaintiff must show that she: (1) belonged to a protected class; (2) was qualified for the position in question; (3) was terminated; and also that (4) persons not in the protected class were retained.  See In re Carnegie Associates, 129 F.3d 290, 294-95 (3d Cir. 1997); Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 2002).

This Court need not analyze whether Plaintiff established a prima facie case under ADEA or under Title VII, because Lucent assumed, for purposes of its motion, that Plaintiff could

establish a prima facie case under both statutes.  (Def. Br. at 14.)

      2.     <u>Legitimate, Non-Discriminatory Reason</u>

The second prong of the <u>McDonnell Douglas</u> analysis requires that the defendant articulate a legitimate, non-discriminatory reason for its employment action against the plaintiff. In order to satisfy its burden of production, a defendant only needs to introduce evidence that, if taken to be true, would permit the conclusion that the reason for the adverse employment action was non-discriminatory.  <u>Fuentes</u>, 32 F.3d at 763.

In this case, Lucent has satisfied the intermediate burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination.  Defendant has proffered that it terminated Plaintiff's employment as part of a RIF that was implemented in response to difficult business conditions, and points to deposition testimony in the record in support of this explanation. (Hickey Dep. Tr. 31:24-32:16; Timblin Dep Tr. 50:9-15; Buchalski Cert. ¶ 6; Ex. A to Buchalski Cert.)  As a matter of company policy, Lucent used a rating process to decide if and how a RIF must be implemented.  (Exs. C and D to Buchalski Cert.)  Lucent asserts that this rating process considers factors having nothing to do with age or gender.[6]

Neither the ADEA nor Title VII are vehicles for second guessing business decisions.  <u>See Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070 (3d Cir. 1992); <u>see also</u> <u>Williams v. Rumsfeld</u>, 44 Fed. Appx. 592, 594 (3d Cir. 2002) (unpublished) (concluding that, in a case alleging racial discrimination and retaliation under Title VII, the Department of Defense had articulated a legitimate, non-discriminatory reason for the plaintiff's termination – namely, that she had been

---

[6]It is worth noting that Plaintiff has not challenged the accuracy of her score, or her score relative to others in her universe, or the underlying rating process itself.  (Exs. D and E to Buchalski Cert.)

terminated in connection with a RIF, conducted in a manner consistent with Office of Personnel Management procedures).  Competent employees often are terminated as part of a RIF and, as Defendant correctly argues, neither the length of employment, nor adequate to good performance evaluations, necessarily precludes a business from terminating competent employees.  This Court concludes that Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination.

       3.     <u>Pretext for Discrimination</u>

At this final stage of the <u>McDonnell Douglas</u> framework, Plaintiff must direct this Court to evidence in the record that might persuade a reasonable factfinder that Lucent's articulated reason is pretext, masking a discriminatory motive.  Plaintiff must show "such weaknesses, implausibilities, inconsistencies . . . or contradictions in [the defendant's] proffered legitimate reason [such] that a reasonable factfinder could rationally find them unworthy of credence." <u>Fuentes</u>, 32 F.3d at 765.  Because Plaintiff has not pointed to any evidence that creates a genuine issue of material fact as to whether Defendant's proffered reason is a pretext for age or gender discrimination, Defendant's motion for summary judgment on these claims is granted.

       a.     <u>Pretext for Age Discrimination</u>

Plaintiff asserts that there are at least two bases on which a reasonable factfinder could conclude that the FMP, or RIF, was merely a pretext for unlawful, age-based age discrimination: (1) the circumstances surrounding her transfer into the MTS classification[7]; and (2) her history of performance at the company.  Because this Court cannot find support in the record for these

---

       [7]This argument does not acknowledge the fact that Plaintiff apparently went from SGB to MGR, before ultimately moving into MTS.  (Ex. B to Parker Reply Cert.)  This particular omission is not critical to this Court's resolution of Defendant's motion on Plaintiff's ADEA claim.

arguments, summary judgment is granted to Defendant on Plaintiff's ADEA claim.

i.    *Reclassification*

Plaintiff's principal basis of opposition to Defendant's motion is that the circumstances surrounding her classification into MTS could persuade a reasonable factfinder that unlawful age discrimination factored into Lucent's reclassification of Plaintiff and its determination to terminate her.  This Court concludes that Plaintiff has failed to show that there are any genuine issues as to any material fact which a factfinder is required to resolve.

The gist of Plaintiff's opposition is this: her transfer from SGB to MTS is evidence that she was "set up" for placement on FMP status (and subsequent termination).  According to Plaintiff, the transfer was a "set up" because, had she remained SGB-classified, "she would have been the oldest person in that population."  (Pl. Br. at 7.)

There are several problems with this assertion.  First, even if this factual proposition were true – i.e., that, had Plaintiff remained in SGB, she would have been the oldest person in her former classification – the legal significance that Plaintiff seeks to attach to this fact remains a mystery.  Perhaps Plaintiff is asserting that, had she remained SGB-classified, she would have been "the oldest employee in that classification" (Pl. Br. at 7) *and would not have been terminated*.  She never makes this point expressly, and for good reason.  Implicit in this suggested reading of this argument is the untenable notion that the ADEA absolutely shields the oldest worker in a universe of employees from adverse employment decisions.

Second, Plaintiff fails to direct this Court to anything in the record that might support her conclusion that age discrimination factored into her reclassification and subsequent inclusion in the FMP.  Essentially, she believes that her age must have factored into Lucent's reclassification of her, and ultimately its inclusion of her in the FMP, because she "is not aware of any other

11

employee in her group who was reclassified from an SGB level to an MTS level." (Pl. Br. at 7.) She concludes that, therefore, she must have been "the only female, as well as the oldest employee to be reclassified *in preparation for* the April 30, 2001 rolling lay-offs." (Pl. Br. at 9) (emphasis added). Notably, however, Plaintiff does not point to any facts in the record that would support the allegation as to whether, or how many, employees in her group were reclassified.[8]

Indeed, the major weakness in Plaintiff's opposition is that she does not point to any facts in the record that would support her propositions. For example, she relies upon an "awareness" of facts, but an "awareness" of facts that do not exist, either to her knowledge or in the record, is insufficient to create a genuine issue as to a material fact, for purposes of defeating a summary judgment motion. In fact, according to Plaintiff's own deposition testimony, she was not "aware" of whether Lucent changed the classification of other employees because she "didn't inquire." (Pl. Dep. Tr. at 49:14-17.) To the extent Plaintiff's discrimination claim rests on the idea that Lucent's reclassification of Plaintiff was a pretext for discrimination, she should have discovered (and directed this Court to) facts relevant to employee reclassification. Finally, Plaintiff asserts that the company reclassified her "in preparation for" the FMP but, again, fails to direct this Court to evidence that might support a connection between Lucent's reclassification of Plaintiff and her inclusion in the FMP.

In the absence of facts that might create a genuine issue for a factfinder to resolve, Plaintiff's assertions amount to the sort of conclusory statements, general denials, and factual

---

[8]Moreover, at the time that Plaintiff was deposed, she testified that she did not understand the differences, if any, between the classifications, and at most, she testified that, at the time that Lucent changed her classification to MTS, she "wasn't sure why they were actually reclassifying me." (Pl. Dep. Tr. at 45:4-5.)

allegations not based on personal knowledge that are insufficient to avoid summary judgment. See Olympic Junior, Inc., v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972).  Plaintiff cannot point to any facts in the record that explain how her reclassification to MTS "set the stage" for her placement on FMP status in April 2001, or ultimately, her termination in June 2001. Plaintiff's brief amounts to allegation and speculation, and it is therefore not altogether surprising that pages 7 though 10, which address Lucent's motion with respect to Plaintiff's ADEA claims, lack a single citation to the factual record.

<em>ii.</em>    <u><em>Positive Work History</em></u>

The gist of Plaintiff's second argument is this: in light of her "highly valued service to the company," she should not have been reclassified – a step that, she contends, resulted in her placement on FMP status and ultimately, in her termination.  The fact that she was reclassified, and terminated, notwithstanding her longstanding and positive history with the company, according to Plaintiff, is evidence that unlawful age discrimination played a role in her termination.  In this Court's judgment, a reasonable factfinder could not so conclude.

To be sure, Plaintiff's positive performance evaluations during the course of her employment and her longstanding dedication to the company is reflected in the record.  (Pl. Tr. 32:2-4, 33:8-12; Exs. E and F to Parker Cert.)  The company does not dispute that Fletcher was an adequate, or even good, employee.  Sproles, Plaintiff's supervisor, even testified that Plaintiff was a "good" performer.  (Sproles Dep. Tr. 29:1-14.)

Considerations such as strong performance evaluations, and a long history of employment with a company cannot protect even competent employees from a RIF, however.  See Healy v. New York Life Ins. Co., 860 F.2d 1209, 1220 (3d Cir. 1988) (stating that "the essence of a RIF is that competent employees who in more prosperous times would continue and flourish at a

13

company may nevertheless have to be fired").  Furthermore, an employee's opinion of her own contributions, in terms of performance, time and dedication, to a company is insufficient to create a genuine issue as to whether the company's grounds for terminating the employee are a pretext for unlawful discrimination.  See Fowle v. C&C Cola, 868 F.2d 59, 65-67 (3d Cir. 1989) (stating that an employee's subjective opinion of his or her own performance is not relevant to employment discrimination cases).  Based on the evidentiary record, this is what occurred here – only exceptional performers survived the RIF.

> ### iii.   *Other Considerations*

Additional considerations lead this Court to conclude that there are no genuine issues of material fact for a factfinder to resolve with respect to Plaintiff's ADEA claim.  For instance, Plaintiff makes certain factual assertions that do not appear to be supported by the record at all. Indeed, Plaintiff claims that the only employees "remaining in her unit" were younger (Pl. Br. at 7), but of the five employees in her unit who were retained, four of them actually were older than Plaintiff.  (Def. SOF ¶ 37.)

Finally, this Court observes that Plaintiff never challenged the method by which she was evaluated or selected for FMP status (Pl. Dep. Tr. 179:16-20), or suggested some other basis for disbelieving Defendant's reason for her termination, or for believing that age discrimination factored into her termination.  See Fuentes, 32 F.3d at 765 ("[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd prudent, or competent.").

As there are no genuine issues of material fact as to whether Lucent's termination of Plaintiff should be disbelieved, or as to whether her age unlawfully factored into Defendant's

termination decision, summary judgment is granted to Lucent on Plaintiff's ADEA claim.

            b.      <u>Pretext for Sex Discrimination</u>

Defendant seeks summary judgment on Plaintiff's gender discrimination claim on the basis that there are no genuine issues of material fact as to whether its proffered reason is a pretext for discrimination prohibited by Title VII.  As stated above, Defendant has assumed, for purposes of the instant motion, that Plaintiff can establish a prima facie case of discrimination, and as this Court has concluded, Defendant has satisfied its burden to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.  Thus, to defeat Defendant's motion for summary judgment with respect to her sex discrimination claim, Plaintiff must point to evidence in the record that creates a genuine issue as to a material fact for a reasonable factfinder to resolve – either as to the believability of Lucent's proffered explanation for her termination or with respect to whether unlawful gender discrimination motivated its decision making process. <u>See</u> <u>Fuentes</u>, 32 F.3d at 764.  In this instance, this Court concludes that Plaintiff has not satisfied the burden of demonstrating that there is a genuine issue as to a material fact for a factfinder to resolve on the question of whether Lucent's proffered explanation for terminating Plaintiff is a pretext.

Even granting Plaintiff all favorable inferences, the evidence relevant to Plaintiff's Title VII claim in this record is scant.  Plaintiff contends, in her brief, that when she "wrote numerous e-mails to her immediate supervisor, Ed Sproles, regarding the male-dominate [sic] environment, which he exclusively catered to, Mr. Sproles [sic] response was to [say] 'leave the company if you don't like it.'" (Pl. Br. at 7.)  These e-mails are not quoted in, or attached to, her opposition brief.  As for Sproles' response, this account of her exchange with him appears to be based loosely upon her deposition testimony.

15

The following exchange took place on direct examination of Plaintiff at her deposition:

Q        Before you left Lucent, did you ever have any meetings or discussions with anyone from human resources or call employment opportunity?

A        No.

Q        No.  You registered no complaint with the company about male-dominated environment?

A.       No.

Q        Did you ever register any complaints, oral or written, with anyone at Lucent about your concerns about it being a male-dominated environment?

A.       No.  I spoke to Ed Sproles about feeling that I wasn't being included as a respected member of the team.

(Pl. Dep. Tr. 99:20-100:8.)

According to Plaintiff's own testimony, she never registered a complaint about a "male-dominated environment" and when asked expressly about whether she raised the issue with anyone about the "male-dominated environment," Plaintiff testified that she had not addressed this subject with anyone at Lucent.[9]  In addition, it appears that the comment, "leave the company if you don't like it," was Sproles' response to her complaint that she was not a "respected member" of the team, not specifically about a "male dominated environment."[10]  Further,

_____

[9]This raises questions about the factual basis for the assertion that Plaintiff makes in her brief about her having sent numerous complaints in writing (i.e., e-mail) about the male-dominated environment to her supervisor.

[10]In any event, Plaintiff has not identified when the statement was made, but seems to recall that it was made sometime before April 2000.  See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997) (finding stray remarks by non-decision maker insufficient to support an inference of discrimination); see also Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1993) (stating that stray remarks "by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision").  While Sproles was Plaintiff's supervisor, it does not appear that he ultimately made the determination to terminate Plaintiff.  Furthermore, even if Sproles executed the evaluation that led to her inclusion in the FMP, Plaintiff has not challenged the score she received, or the rating process, in her submissions, as evidence of discrimination or that the RIF is a pretext for what was unlawful discrimination.

Plaintiff is asked about emails to Sproles, in which she ostensibly "mak[es] reference" to the male dominated environment, but she does not direct this Court to the text of any particular email.

Plaintiff also suggests that the fact that all retained employees in her universe were male suggests that the RIF is just a pretext for gender discrimination.  This alone is insufficient to create a genuine issue as to a material fact for a factfinder to resolve.  Plaintiff was the only female in her universe, and men also were terminated as part of the RIF.

In addition, to the extent Plaintiff relies on the view that sex discrimination played a role in her reclassification (and by extension, in Plaintiff's view, her inclusion in the FMP and ultimately, in her termination), this claim, too, suffers from the absence of genuine issues of material fact.  An "awareness" that Plaintiff may have been the only woman to be transferred from one classification to another, without more, after she has been granted the opportunity for discovery, is insufficient for purposes of defeating a summary judgment motion.

Altogether, the factual assertions, upon which Plaintiff relies in support of her gender discrimination claim, are insufficient to create a genuine issue as to a material fact regarding whether Lucent's proffered explanation for Plaintiff's termination should be disbelieved, or as to whether unlawful gender discrimination motivated its decision to terminate Plaintiff.  Accordingly, Lucent's motion for summary judgment on Plaintiff's Title VII claim is granted.

**B.     ERISA Claim**

At count 3 of her second amended complaint, Plaintiff alleges that the "actions of Defendant in terminating Plaintiff based on poor job performance were pretextual so as to preclude her eligibility from the 5+5 enhanced pension and medical benefits."  (Compl. ¶ 17.) She alleges that her termination prior to her attainment of eligibility for the Plan constitutes

17

unlawful interference with her rights under ERISA, in violation of section 510 of ERISA. (Compl. ¶ 18.)  She does not claim deprivation of her otherwise acquired benefits.  (Compl. ¶ 6.)

As previously set forth in detail above, Lucent contends that it introduced the 5+5 Plan ("the Plan") in an effort to encourage voluntary retirement on the heels of failed merger talks with Alcatel.  (Hickey Dep. Tr. 11:24-13:22.)  Essentially, the Plan was a voluntary retirement program, offered between June 11, 2001 and July 13, 2001, which provided for the addition of five years of service and five years of age to those employees eligible to participate.  (Pl. Dep. Tr. 150:6-20; Def. SOF ¶ 45; Exs. G and I to Parker Cert.)  Employees on FMP status were not eligible to participate.

Under section 510 of ERISA, it is unlawful "for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . *or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan*."  29 U.S.C. § 1140 (emphasis added).  Section 510 was enacted "primarily to prevent 'unscrupulous employers from discharging or harassing their employers in order to keep them from obtaining vested pension rights."  See DeWitt v. Penn-Del Directory Corp., 106 F.3d 514, 522 (3d Cir. 1997).

To recover under section 510, a plaintiff does not have to establish that the sole reason for termination was to interfere with the plaintiff's pension rights, but the plaintiff must demonstrate that the defendant had the specific intent to violate ERISA.  See Gavalik v. Continental Can Co., 812 F.2d 834, 851 (3d Cir. 1987).  Proof of incidental loss of benefits, which results from termination, will not constitute a violation of section 510.  See id.  Thus, the essential element of proof under section 510 is specific intent to engage in proscribed activity.

18

Proof of specific intent to interfere with pension eligibility ordinarily will constitute a violation of section 510 "regardless of whether the interference is successful and regardless of whether the participant would actually have received the benefits absent the interference." Id. at 852 (internal citations omitted). Because there often is not "smoking gun" evidence of specific intent, parties seeking to establish section 510 claims may rely upon circumstantial or indirect evidence of intent. Id. In this Circuit, section 510 claims based upon indirect evidence of intent may be proven pursuant to the McDonnell Douglas burden shifting framework applicable to indirect evidence claims raised under Title VII. See id.

Proving a section 510 claim under the McDonnell Douglas framework requires the plaintiff to demonstrate the existence of a prima facie case, i.e., (1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled. See id. Upon the plaintiff's satisfaction of this burden, the defendant must point to admissible evidence of a legitimate, non-discriminatory reason for its actions. Id. at 853.

If the defendant satisfies this burden, the burden of proof then returns to the plaintiff to demonstrate that the proffered explanation should be disbelieved or that unlawful discrimination more likely motivated the defendant's conduct. See id. To survive summary judgment, the plaintiff must show that there are genuine issues as to a material fact regarding whether: (1) to disbelieve employer's articulated reason for the adverse employment action; or (2) to believe the discriminatory reason claimed is more likely than not the actual reason for the adverse action. See Kowalski, 82 F.3d at 1289 (citing Fuentes, 32 F.3d at 764). It is permissible for the plaintiff to use the same facts to show that the defendant's proffered explanation should be disbelieved in order to show that the defendant had the specific intent to violate ERISA. See Kowalski v. L&F

19

Prods., Inc., 82 F.3d 1283, 1291 (3d Cir. 1996).

Defendant moves this Court for summary judgment on Plaintiff's ERISA claim on the basis that there are no genuine issues as to a material fact as to whether Defendant acted with the specific intent to violate ERISA.  (Def. Br. at 21.)  Defendant asserts that Plaintiff cannot establish that it acted with the intent to deprive her of the attainment of benefits, namely, "enhanced pension benefits" (Def. Br. at 21) under the 5+5 Plan.  According to Defendant, if it placed Plaintiff on FMP status in April 2001 as part of a broader layoff – *before* Lucent even created the 5+5 Plan in May 2001, and *before* it announced the availability of the Plan to employees in June 2001 – it could not have terminated her with the intent to deprive her of these benefits.   Ostensibly, this proposition stands, even if she was terminated shortly *after* the Plan was offered to eligible employees, because the critical date is not when she actually was terminated, but rather when she was included in the FMP, since it was her FMP status that precluded her (and other employees included in the FMP) from participating in the Plan.  Her official termination date simply was the date on which her 60-day period of FMP status expired.

Plaintiff opposes Defendant's motion on the grounds that a factfinder could disbelieve Lucent's claim that it did not conceive of the 5+5 Plan until Memorial Day weekend in 2001, i.e., after Plaintiff already had been placed on FMP status.  Plaintiff argues that, if a factfinder could disbelieve Lucent's evidence, then it also could reject Lucent's assertion that it could not have terminated, and did not terminate, Plaintiff with the specific intent to violate ERISA.  (Pl. Br. at 3-4.)

According to Plaintiff, there are a few reasons why a reasonable factfinder could disbelieve the proposition that Lucent developed the Plan over Memorial Day weekend in 2001.  First, Plaintiff suggests that Lucent was privy to financial trouble before the merger talks with

20

Alcatel failed on or about May 29, 2001.  (Pl. Br. at 5) (stating that, other than the failure of

merger talks, "there were clearly other indicia of the decay of Lucent's financial health").

Second, Plaintiff contends that, as Lucent is a large company, it is simply not credible that Lucent

would have waited until Memorial Day weekend, after merger talks failed, to call emergency

meetings and develop a response like the 5+5 Plan in three days.  (Pl. Br. at 5.)  Plaintiff argues:

> The trier of fact could easily reject the testimony of Mr. Hickey that the emergence
> of the antidote for bankruptcy in the form of a 5 + 5 pension plan was designed in
> two to three days and was solely triggered by the failure of the Alcatel merger, which
> allegedly plummeted Lucent into a freefall financial hole that only bankruptcy could
> halt.  The trier of fact could easily reject that once the merger talks failed there
> existed no other back-up plan to help the financially ailing Lucent.  Mr. Hickey,
> therefore, claims that he and two other executives hastily designed and announced
> the 5 + 5 pension plan without the benefit of detailed cost analysis, actuarial studies
> and approval by the benefits committee and the like.  It is functionally impossible and
> certainly incredulous that only three days of intense work was all that was necessary
> to salvage a worldwide company in dire financial straits . . . Further, even if it is
> accepted that Defendant had to reduce its workforce because of dwindling cash
> reserves, it is nonetheless hard to swallow that a worldwide company such as Lucent
> had not prepared for the probability of the Alcatel talks failing long before May 29,
> 2001.  Therefore, Lucent's explanation of the chain of events or lack thereof is
> simply disingenuous and arrogant . . . .

(Pl. Br. at 4-5.)

Upon considering the record and the parties' submissions, this Court concludes that there

are no genuine issues as to a material fact regarding whether Defendant acted with the specific

intent to violate ERISA.  Accordingly, Defendant's motion with respect to Plaintiff's ERISA

claim is hereby granted.

In this case, Plaintiff's ERISA claim is based upon circumstantial evidence of

discrimination.  Thus, the McDonnell Douglas burden shifting framework applies to the analysis

of her claim.  In keeping with this framework, Defendant, as the moving party, has asserted, and

pointed to evidence, that it did not place Plaintiff on FMP status, and later develop and offer the

21

5+5 Plan, with the purpose of interfering with Plaintiff's ERISA-protected benefits.  Indeed, it has shown, by way of deposition testimony, that Lucent did not develop and offer the 5+5 Plan until *after* Plaintiff (and many other employees) were placed on FMP status, a designation that not only led to their termination in June 2001 but also rendered them ineligible to participate in the 5+5 Plan before their termination dates.  The evidentiary record suggests that no reasonable factfinder could conclude that, in conducting the RIF that terminated Plaintiff's employment, Lucent acted with the specific intent to violate ERISA and avoid its obligations to its employees thereunder.

Plaintiff argues that a factfinder could reject Defendant's story as not credible, and therefore, that its motion should be denied.[11]  Plaintiff claims that a factfinder could disbelieve Lucent's evidence concerning the timing of its creation of the Plan, because Lucent is a worldwide company, and long before any merger talks actually failed, it would have developed backup or contingency plans in the event that major merger talks failed.  (Pl. Br. at 5) (arguing that "it is . . . hard to swallow that a worldwide company such as Lucent had not prepared for the probability of the Alcatel talks failing long before May 29, 2001").

This Court disagrees. Once Defendant satisfies its burden under Rule 56, Plaintiff "must

---

[11]Although Lucent seeks summary judgment on the basis that there are no genuine issues as to a material fact regarding whether Plaintiff even could establish a prima facie case under section 510 because she has no evidence that Lucent intended to violate ERISA, Plaintiff does not address directly this argument.  Rather, Plaintiff focuses exclusively on whether a reasonable factfinder could disbelieve Lucent's version of how the company developed, and later offered, the 5+5 Plan.  It also is important to note that the fact that Plaintiff focuses on pretext, rather than whether there are genuine issues of fact as to whether she has a prima facie case under section 510, is not the basis for granting summary judgment to Lucent.  As stated previously, the facts on which a non-moving party relies to show pretext also may be used to infer specific intent to violate ERISA.  See Kowalski, 82 F.3d at 1291 (stating that the "same facts Kowalski offered to show [Defendant's] proffered non-discriminatory reason for terminating her was pretextual can be used to infer [Defendant's] specific intent to violate ERISA").

do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co., 475 U.S. at 586. Plaintiff must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations. See Sound Ship Bldg. Co., 533 F.2d at 99. Notwithstanding these requirements for defeating a summary judgment motion, Plaintiff has not cited to any facts in the record upon which a reasonable factfinder could rely in order to decide this claim in Plaintiff's favor. Plaintiff has not pointed to anything in the record that might lead a reasonable factfinder to conclude that the evidence of the timeline of events – the placement of employees on FMP status in April 2001, the failure of merger negotiations in May 2001, and finally, the creation and offering of the 5+5 Plan – should be rejected or doubted. See Fuentes, 32 F.3d 759, 764-5 (stating that, to discredit an employer's proffered reasons for an adverse employment action, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent").

The factors that Plaintiff seeks to have this Court consider here, namely, that Lucent is a worldwide company that, she suspects, likely had a backup plan long before Memorial Day weekend in 2001, and would never have required an emergency response to failed merger talks, are not supported by facts in the record, amount to speculation, and are insufficient to create a genuine issue for a factfinder to resolve.[12]

Based on this Court's consideration of the parties' submissions, this Court is not

---

[12]While Plaintiff vigorously disputes the notion that Lucent developed the Plan over Memorial Day weekend in 2001, she does not point to any evidence that confounds Lucent's claim that the Plan was formulated *after* the company decided to include her in the FMP.

persuaded that there are genuine issues as to a material fact for a factfinder to resolve with respect to Plaintiff's ERISA claim.  Thus, Lucent's summary judgment motion on Plaintiff's ERISA claim is granted.

## **CONCLUSION**

For the foregoing reasons, this Court grants Defendant's motion for summary judgment on each count of Plaintiff's' Complaint.


DATED: September 27, 2005


       S/Joseph A. Greenaway, Jr.

       JOSEPH A. GREENAWAY, JR., U.S.D.J.